Barry I. Levy
Michael A. Sirignano
Michael Vanunu
Melissa D. Medilien
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                         Plaintiffs,

           -against-

SONA GEVORGYAN, GEVORINA, INC., and
JOHN DOE DEFENDANTS "1" – "10",

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.: _____(     )

**Plaintiffs Demand a
Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $180,000.00 the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of

fraudulent claims seeking payment for medically unnecessary, illusory, and otherwise

unreimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g., intermittent thermal compression and cold therapy systems ("CTUs"), ultrasound therapy systems ("ultrasound devices"), ultrasound patches, and deep vein thrombosis devices ("DVT Devices"), etc.) (collectively, the "Fraudulent Equipment") through Defendant Gevorina, Inc. ("Gevorina").

2.     Gevorina is a "retailer" that purports to rent and/or sell DME and OD to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").   Gevorina was incorporated by Sona Gevorgyan ("Gevorgyan"). Gevorgyan devised a scheme in conjunction with John Doe Defendants "1" through "10" (hereinafter, the "John Doe Defendants"), who are not readily identifiable to GEICO, that are associated with various multi-disciplinary medical offices that treat a high-volume of No-Fault insurance patients ("Clinics") and ambulatory surgical centers ("Surgery Centers"), to obtain prescriptions purportedly issued from various healthcare providers (the "Prescribing Practitioners") that were used to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly renting and providing Fraudulent Equipment that were medically unnecessary, illusory, and otherwise not reimbursable.

3.     Based upon the prescriptions for Fraudulent Equipment issued by the Prescribing Practitioners, Gevorina and Gevorgyan (collectively, the "Defendants") sold and rented Fraudulent Equipment to Insureds.

4.     GEICO seeks to recover more than $180,000.00 that has been wrongfully obtained by the Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.8 million in pending No-Fault insurance claims that have been submitted through Gevorina because:

(i)     The Defendants billed GEICO for Fraudulent Equipment purportedly rented or sold to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable, including the John Doe Defendants;

(ii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was rented or sold – to the extent any Fraudulent Equipment was provided – pursuant to prescriptions issued by the Prescribing Practitioners as a result of predetermined fraudulent protocols, which were implemented solely to financially enrich the Defendants and others who are not presently identifiable, rather than to treat the Insureds;

(iii)   The Defendants billed GEICO for Fraudulent Equipment when the Defendants fraudulently misrepresented that they provided the DME/OD identified on the bills and that the charges were permissible when the Defendants grossly inflated the reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.      The Defendants fall into the following categories:

(i)     Defendant Gevorina is a New York corporation that purports to sell and rent Fraudulent Equipment to Insureds and bills New York automobile insurance companies including GEICO for the sale and/or rental of the Fraudulent Equipment.

(ii)    Defendant Gevorgyan owns, operates, and controls Gevorina and uses Gevorina to submit fraudulent bills to GEICO and other New York automobile insurers seeking No-Fault insurance benefits for Fraudulent Equipment that is purportedly sold and/or rented to automobile accident victims.

(iii)   The John Doe Defendants are citizens of New York who are presently not identifiable but are associated with various Clinics, Surgery Centers, and the Prescribing Practitioners, and who have conspired with the Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6.      As discussed below, the Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The Fraudulent Equipment was rented and sold – to the extent that any DME/OD was actually provided – based upon prescriptions received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable, and, thus, not eligible for No-Fault insurance reimbursement in the first instance;

(ii)    The prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently identifiable, rather than to treat or otherwise benefit the Insureds; and

(iii)    To the extent that any Fraudulent Equipment was rented and/or sold to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO and other New York automobile insurers misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

7.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Gevorina.

8.    The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.    The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than May of 2018 and the scheme has continued uninterrupted since that time.

10.    As a result of the Defendants' scheme, GEICO has incurred damages of more than $180,0000.00.

## THE PARTIES

### I.   Plaintiffs

11.    Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    **Defendants**

12.    Defendant Gevorina is a New York corporation with its principal place of business in Williston Park, New York.  Gevorina was incorporated on or about May 17, 2018, is owned, operated and controlled by Gevorgyan, and has been used by Gevorgyan, with the assistance of others not presently identifiable by GEICO, including the John Doe Defendants, as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.    Defendant Gevorgyan resides in and is a citizen of New York.  Gevorgyan, is not and has never been a licensed healthcare provider. Gevorgyan owns, operates, and controls Gevorina, and entered into agreements with others who are not presently identifiable, including the John Doe Defendants, to allow Gevorina to obtain prescriptions for the Fraudulent Equipment purportedly issued by the Prescribing Practitioners.

14.    Gevorgyan is no stranger to the types of fraudulent schemes employed by Gevorina, including the manner by which to obtain prescriptions for Fraudulent Equipment and submit fraudulent bills to New York automobile insurers, including GEICO. Notably, Gevorgyan, at the time that he purportedly operated Gevorina, was also employed as a legal assistant at the Law Office of Akiva Ofshtein, which is a law firm that specializes in the connection collection of No-Fault insurance benefits and represents various other healthcare providers who have perpetrated schemes similar to the one identified herein.

15.    The John Doe Defendants are citizens of New York and are not presently identifiable but are associated with the Clinics, Ambulatory Surgery Centers, and Prescribing Practitioners, and who have conspired with Gevorina and Gevorgyan to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the Pertinent Laws

#### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

20.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

21.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including DME and OD. See N.Y. Ins. Law § 5102(a).

23.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

24.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

26.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

27.     Prohibited kickbacks include more than a simple payment of a specific monetary amount, but it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

28.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

29.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

30.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

31.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

32.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

33.      Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME and OD that were provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, DME and OD that were provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

34.      DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as CTUs, ultrasound devices, ultrasound patches, and DVT Devices.

35.      OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as shoulder, knee, and lumbar orthotics.

36.      To ensure that Insureds' $50,000.00 in maximum PIP Benefits are not artificially depleted by inflated DME or OD charges, the New York Fee Schedule sets forth maximum charges that may be submitted by healthcare providers for DME and OD.

37.      In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

38.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum

charges all DME or OD provided before April 4, 2022, as follows:

> (a)     The maximum permissible charge for the purchase of durable medical
> equipment… and orthotic [devices] . . . shall be the fee payable for such
> equipment or supplies under the New York State Medicaid program at the
> time such equipment and supplies are provided . . . if the New York State
> Medicaid program has not established a fee payable for the specific item,
> then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the
> line item cost from a manufacturer or wholesaler net of any rebates,
> discounts, or other valuable considerations, mailing, shipping, handling,
> insurance costs or any sales tax) to the provider plus 50%; or (2) the usual
> and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

39.     As indicated by the New York Fee Schedule, payment for DME or OD is directly

related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

40.     According to the New York Fee Schedule, in instances where Medicaid has

established a maximum permissible charge for DME or OD ("Fee Schedule item"), the fee payable

for the item is set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

41.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the

Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning

Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME

and OD companies to seek reimbursement for – among other things – Fee Schedule items. The

HCPCS Codes and their definitions provide specific characteristics and requirements that an item

of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

42.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS

Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained

within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and

Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

43.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

44.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

45.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

46.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

47.     As it relates to charges for renting DME or OD, prior to April 4, 2022, the New York Fee Schedule sets forth the maximum charges as follows:

> [t]he maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office.  The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b)

48.     As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the lower of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

49.     Additionally, DME/OD suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

50.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services, of Fee Schedule items is 10% of the maximum reimbursement amount.

51.     However, when DME or OD is rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount then the maximum charge for a monthly rental is 10% of the acquisition cost for the DME or OD, which includes all supplies that are provided with DME rental. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

52.     For charges related to the rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and

defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

53.     Regardless of whether DME or OD is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. <u>See</u> 12 N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

54.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either an NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The prescription for DME or OD was not based any unlawful financial arrangement;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient;

(v)     The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item; or

(vi)    The *pro rata* monthly rental fee sought for renting DME or OD to an Insured was not in excess of: (a) 10% of the maximum reimbursement rate for Fee Schedule items; (b) 10% of the acquisition cost for Fee Schedule items without a listed maximum reimbursement rate; or (c) the price to the public for Non-Fee Schedule items.

II.      **The Defendants' Fraudulent Scheme**

A.      **Overview of the Defendants' Fraudulent Scheme**

55.      Beginning in or about 2018, Gevorgyan masterminded and implemented a complex fraudulent scheme in which Gevorina was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were not entitled to receive.

56.      Gevorgyan used Gevorina to directly obtain No-Fault Benefits and maximize the payments he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fraudulent Equipment.

57.      Between July 2018 and the present, the Defendants submitted more than $2.3 million in fraudulent claims to GEICO through Gevorina seeking reimbursement for Fraudulent Equipment. To date, the Defendants have wrongfully obtained more than $180,000.00 from GEICO, and there is more than $1.8 million in additional fraudulent claims that have yet to be adjudicated but for which the Defendants continue to seek payment from GEICO.

58.      The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Practitioners because of secret agreements with John Doe Defendants, who are not presently identifiable.

59.      As part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by Prescribing Practitioners that claimed to have treated the Insureds at a Clinic.

60.      In order to maintain a presence at or an association with the Clinics or in exchange for other financial compensation or incentive, the Prescribing Practitioners, at the direction of the

others who are not presently identifiable, including the John Doe Defendants, would purportedly issue virtually identical prescriptions for DME and/or OD to almost every Insured with whom they came into contact as a result of a motor vehicle accident.

61.     In addition, the obtained prescriptions for Fraudulent Equipment purportedly issued by Prescribing Practitioners who performed surgeries generally involved minimally invasive arthroscopic procedures on the Insureds.

62.     The Defendants received the prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Practitioners as part of unlawful financial arrangements with third parties who are not presently identifiable, including the John Doe Defendants, and directly from the Prescribing Practitioners or Clinics without any contact or communication with the Insureds.

63.     In keeping with the fact that the prescriptions for Fraudulent Equipment were issued as part of unlawful financial arrangements with third parties not presently identifiable, many of the prescriptions used by the Defendants to bill GEICO for the Fraudulent Equipment involved inauthentic signatures by the Prescribing Practitioner, such as a photocopied signature, signature stamp, or typed signature.

64.     Once the Defendants received the prescriptions from the Prescribing Practitioners, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for Fraudulent Equipment that was purportedly provided to the Insureds.

65.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment, the Defendants indicated that they provided Insureds with medically necessary Fraudulent Equipment as determined by a healthcare provider licensed to prescribe DME and/or OD.

66.     However, none of the charges identified in Exhibit "1" were for medically necessary Fraudulent Equipment.  Rather, all of the charges were related to the sale or rental of medically unnecessary CTUs, DVT Devices, ultrasound devices, and ultrasound patches.

67.     For example, the charges related to the rental of CTU's and ultrasound units for weeks at a time were routinely based upon either (i) prescriptions received after minimally invasive arthroscopic procedures when the post-operative care included physical therapy, obviating the need for either type of device; or (ii) prescriptions received after the Insureds underwent an examination at one of the Clinics where the Insured was also receiving physical therapy, obviating the need for either type of device.

68.     Additionally, the length of the rentals to Insureds for the Fraudulent Equipment virtually always exceeded any period of medical utility and did not comport with generally accepted medical guidelines.

69.     Similarly, the DVT Devices were routinely dispensed to Insureds following arthroscopic surgery on an Insured's knee or shoulder when the Insureds were immediately ambulatory following the procedure and without any documented ambulatory defect, obviating the need for a DVT Device.

70.     Moreover, in furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants submitted bills seeking reimbursement at rates that were grossly above the maximum reimbursement rate for providing DME in order to maximize the amounts of No-Fault Benefits they could obtain.

71.     As part of this scheme, The Defendants routinely submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were

grossly above the permissible reimbursement amount for such items to maximize the amount of No-Fault Benefits that they could receive.

72.    For example, the Defendants submitted bills to GEICO seeking reimbursement for DVT Devices, a Non-Fee Schedule item, with grossly excessive reimbursement rates when the DVT Devices provided to Insureds were easily obtainable from legitimate Internet and brick-and-motor retailers for a fraction of the reimbursement rates identified in the bills submitted to GEICO.

73.    As another example, the Defendants submitted bills for renting CTUs and ultrasound units, using Fee Schedule item HCPCS codes, that falsely indicated they were seeking reimbursement at the equivalent of 10% of the acquisition cost of such items for a one-month period. In actuality, the Defendants sought No-Fault Benefits from GEICO, and other automobile insurers, at daily rates that were grossly above the maximum reimbursement rate.

**B.     The Defendants' Illegal Financial Arrangements**

74.    To obtain access to Insureds so Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into illegal agreements with others who are not presently identifiable to GEICO, including the John Doe Defendants, pursuant to which the prescriptions purportedly issued by the Prescribing Practitioners were provided to the Defendants in exchange for financial consideration.

75.    Since at least May 2018, the Defendants engaged in unlawful financial arrangements with others who are not presently identifiable to GEICO, including the John Doe Defendants, to obtain prescriptions for Fraudulent Equipment that could be billed by Gevorina to automobile insurance companies, including GEICO.  The unlawful financial arrangements allowed

the Defendants to submit thousands of charges for Fraudulent Equipment to GEICO and other New York automobile insurers.

76.     As part of the unlawful financial arrangements, the Defendants would pay others who are not presently identifiable, including the John Doe Defendants, either directly or through fictitious businesses, to obtain the prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Practitioners.

77.     The Defendants were, in part, able to enter into unlawful financial arrangements with others who are not presently identifiable, including John Doe Defendants, in order to obtain prescriptions purportedly issued by the Prescribing Practitioners because the Prescribing Practitioners operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

78.     These Clinics provide facilities for the Prescribing Practitioners, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

79.     In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

80.     The Clinics from which the Defendants were able to obtain prescriptions for Fraudulent Equipment allegedly issued by the Prescribing Practitioners, as a result of unlawful financial agreements, included, but were not limited to:

(i)        4014 Boston Road, Bronx, New York;

(ii)       6555 Woodhaven Boulevard, Rego Park, New York;

(iii)      910 East Gun Hill Road, Bronx, New York;

(iv)       204-12 Hillside Avenue, Hollis, New York;

(v)        1975 Linden Boulevard, Elmont, New York;

(vi)       2386 Jerome Avenue, Bronx, New York;

(vii)      409 Rockaway Avenue, Brooklyn, New York;

(viii)     761 Merrick Avenue, Westbury, New York;

(ix)       160-59 Rockaway Boulevard, Jamaica, New York; and

(x)        1963 Grand Concourse Avenue, Bronx, New York.

81.    For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 2386 Jerome Avenue, Bronx from a "revolving door" of more than 75 different health care providers.

82.    Additionally, GEICO has received billing for purported healthcare services rendered at the clinic located at 4014A Boston Road, Bronx from a "revolving door" of more than 75 different health care providers.

83.    GEICO has also received billing for purported healthcare services rendered at the clinic located at 1963 Grand Concourse Road, Bronx from a "revolving door" of more than 30 different health care providers.

84.    Notably, some of the Clinic locations have a well-known history of No-Fault insurance fraud, with the U.S. Government previously identifying several providers that performed services at some of the locations as set up "solely" for, or used in furtherance of, an organized No-Fault fraud crime ring. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y.

2012) (JPO). These locations include 1975 Linden Boulevard, Brooklyn, New York and 2386 Jerome Avenue Bronx, New York.

85.     The John Doe Defendants included unlicensed laypersons, rather than the healthcare professionals working in or for the Clinics, who created and controlled the patient base at the Clinics and directed the fraudulent protocols including securing prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers and directing the prescriptions for Fraudulent Equipment to DME/OD suppliers, including the Defendants.

86.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, many of the prescriptions submitted by the Defendants to GEICO in support of their bills contained inauthentic signatures by the Prescribing Practitioners, such as a photocopied signature, signature stamp, or typed signature.

87.     In also keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined and virtually identical prescriptions for Fraudulent Equipment.

88.     In keeping with the fact that the Defendants engaged in unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment directly from Clinics without any communication or involvement by the Insureds.

89.     As a direct result of the unlawful financial arrangements, the Defendants were able to bill GEICO more than $2.2 million dollars for Fraudulent Equipment in an approximate 18-month period between 2019 and 2020.

90.     In all the claims identified in Exhibits "1," the Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

### C.      The Fraudulent Prescription Protocols

91.     In addition to the unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment allegedly issued by Prescribing Practitioners pursuant to predetermined fraudulent protocols that were designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

92.     In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

93.     Accordingly, almost none of the Insureds identified in Exhibit "1", whom the Prescribing Practitioners purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

94.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – many of the Insureds did not seek treatment at any hospital as a result of their accidents.

95.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and were discharged with nothing more than a minor soft tissue injury such as a sprain or strain.

96.     However, despite the Insureds being involved in relatively minor, low-impact accidents and only suffering from minor injuries – to the extent that the Insureds were actually injured – all the Insureds who treated with each of the Prescribing Practitioners were subject to similar treatment regimens that included virtually identical prescriptions for Fraudulent Equipment.

97.     No legitimate physician, other licensed healthcare provider, or professional entity would issue or otherwise permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

### 1)     The Fraudulent Protocol at the Clinics

98.     The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" by Prescribing Practitioners operating out of Clinics were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, unrelated to whether the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

99.     In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment issued by the Prescribing Practitioners pursuant to the following pattern:

> (i)     the Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident.

> (ii)     the Insured would be seen by a Prescribing Practitioner.

> (iii)     thereafter, the Insured would be issued a prescription for a CTU and/or an ultrasound unit that would be directly provided to the Defendants to fill without any consultation or involvement by the Insured.

100.     In reality, the prescriptions for Fraudulent Equipment provided to the Defendants for virtually all of the Insureds identified in Exhibit "1" were not based on medical necessity but simply part of predetermined fraudulent protocols.

101.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints and presentation are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

102.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

103.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's injury or condition; and (iii) whether the patient is likely to use the DME and/or OD.  In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

104.    If a healthcare provider determines that DME and/or OD is medically necessary to aid in a patient's course of treatment, in a legitimate healthcare setting the provider will not only issue a prescription for the appropriate DME and/or OD equipment but will indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary and/or how it would help the Insureds in their recovery.

105.    Here, and in keeping with the fact that the Fraudulent Equipment was medically unnecessary and issued pursuant to predetermined fraudulent protocols, the Prescribing Providers working at Clinics that purportedly issued Fraudulent Equipment to the Insureds identified in

Exhibit "1" did not identify and/or explain the medical necessity for the Fraudulent Equipment in any contemporaneously dated medical record.

106.    Even more, follow-up examination reports authored by the Prescribing Providers after the purported prescriptions for Fraudulent Equipment, to the extent they even exist, virtually never address whether the Insureds were using the Fraudulent Equipment or whether the Fraudulent Equipment was effective for the purpose prescribed.

107.    In keeping with the fact that the Fraudulent Equipment was medically unnecessary and issued pursuant to a pre-determined fraudulent protocols, all of the Insureds identified in Exhibit "1" that were prescribed DME while treating at a Clinic were prescribed a CTU and/or an ultrasound device from a Prescribing Practitioner pursuant to protocols established at each specific Clinic where the prescription originated.

108.    The CTUs that were prescribed and issued to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

109.    Here, the CTUs were effectively an ice pack or hot pad combined with simple compression to provide cold or hot therapy to a part of a person's body. In fact, there is no evidence to support the conclusion that the use of a CTU provides any different result than using an ice pack or hot pad.

110.    Where a patient is in a position to be able to place an ice pack and hot pack on the injured area and is able to use an elastic bandage for compression, there is no medically necessary reason to use a CTU. This is especially true considering that medical studies have shown no difference in patient recovery or functionality when using a CTU compared to an ice pack.

111.    It is improbable that a legitimate healthcare provider would issue a prescription for a CTU to a patient when the patient is capable of using ice packs, hot packs, and a simple compression bandage.

112.    In keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, there was no indication in contemporaneously dated medical records to explain why the Insureds could not use an ice pack, hot pack, or a compression bandage to treat the Insured's sprains and strains and why a CTU was medically necessary.

113.    In also keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were virtually always prescribed CTUs for weeks at a time when there was no objective evidence that the Insureds were incapable of using an ice pack.

114.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity - the Insureds were virtually always advised to – and typically did – undergo physical therapy, where the Insureds received hot and cold therapy that was essentially identical to the thermal and cryotherapy functions of the prescribed CTUs.

115.    The Fraudulent Equipment prescribed to Insureds is medically unnecessary given the lack of medical support and the Insured's being directed to – and actually undergoing – physical therapy treatments. No legitimate physician acting in each patient's best interest would prescribe the Fraudulent Equipment when the patients were able to – and ultimately did – undergo physical therapy at the same time.

116.    Insureds were also prescribed ultrasound units after undergoing treatment with the Prescribing Practitioners at the No-Fault Clinics.  The ultrasound units that were prescribed and issued to the Insureds identified in Exhibit "1" were also not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

117.    An ultrasound unit works by causing ultrasound waves to travel through the skin to the tissue underneath, which causes the muscles to vibrate and heat up. In a legitimate setting, ultrasound therapy is performed by physical therapists to help to heal muscle pain, muscle spasm, and reduce chronic inflammation.

118.    For a healthcare provider to prescribe an ultrasound unit to a patient for home use, and again in a legitimate setting, the provider would document in contemporaneous notes that the patient is complaining of muscle spasms that are not resolving with medicine and therapy, and that the spasms are reoccurring and are severe, even after undergoing physical therapy.

119.    The Prescribing Practitioners virtually never documented in contemporaneous notes that ultrasound units were being prescribed to Insureds or their medical justification for the prescription, let alone an explanation for why the providing of the ultrasound units were medically necessary.

120.    In keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibit "1" were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued on dates that the Insureds never even treated with the Referring Providers.

121.    Each of the Prescribing Practitioners who purportedly issued prescriptions for Fraudulent Equipment that were routed to the Defendants issued virtually identical prescriptions

to Insureds, regardless of each Insureds individual circumstances, symptoms, or medical presentation.

122.    Many of the prescriptions that were used by the Defendants to support the charges identified in Exhibit "1" were purportedly issued by Jean-Pierre Barakat, M.D. ("Barakat"), and Barakat's prescriptions virtually always included a CTU rental (for periods between 14 and 28 days), an ultrasound unit rental for 28 days, and ultrasound patches.

123.    For example:

(i)      On May 2, 2019, an Insured named DA was purportedly involved in a motor vehicle accident. Thereafter, on June 19, 2019, DA treated with Barakat through Bronx County Medical, P.C. ("Bronx County Medical") at 4014A Boston Road, Bronx (the "Boston Road Clinic"). On July 2, 2019, Barakat purportedly issued a 14-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants.

(ii)     On May 7, 2019, an Insured named JB was purportedly involved in a motor vehicle accident. Thereafter on June 10, 2019, JB treated with Barakat through Bronx County Medical Care at the Boston Road Clinic, and Barakat purportedly issued a 14-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants.

(iii)    On May 7, 2019, an Insured named BW was purportedly involved in a motor vehicle accident. Thereafter, on May 8, 2019, BW treated with Barakat through Bronx County Medical Care at the Boston Road Clinic. On June 12, 2019, Barakat purportedly issued a 14-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants.

(iv)     On August 12, 2019, an Insured named WC was purportedly involved in a motor vehicle accident. Thereafter, on August 15, 2019, WC treated with Barakat through Far Rockaway Medical, P.C. ("Far Rockaway Medical") at 79-45 Metropolitan Avenue, Flushing, New York ("Metropolitan Avenue Clinic"), and Barakat purportedly issued a 14-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants.

(v)      On August 24, 2019, an Insured named IC was purportedly involved in a motor vehicle accident. Thereafter, on August 29, 2019, IC treated with

Barakat through Far Rockaway Medical at the Metropolitan Avenue Clinic. On September 3, 2019, Barakat purportedly issued a prescription for a CTU and a prescription for an ultrasound device, which did not identify the length of time for the rentals, and ultrasound patches that were provided to the Defendants, despite IC not treating with Far Rockaway Medical on that day.

(vi)    On August 24, 2019, an Insured named EC was purportedly involved in a motor vehicle accident. Thereafter, on August 29, 2019, IC treated with Barakat through Far Rockaway Medical at the Metropolitan Avenue Clinic. On September 3, 2019, Barakat purportedly issued a 14-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants, despite EC not treating with Far Rockaway Medical on that day.

(vii)   On August 30, 2019, an Insured named GA was purportedly involved in a motor vehicle accident. Thereafter, on September 5, 2019, GA treated with Barakat though Far Rockaway Medical at the Metropolitan Avenue Clinic. On September 6, 2019, Barakat purportedly issued a 14-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants, despite GA not treating with Far Rockaway Medical on that day.

(viii)  On August 30, 2019, an Insured named AB was purportedly involved in a motor vehicle accident. Thereafter, on September 5, 2019, AB treated with Barakat through Far Rockaway Medical at the Metropolitan Avenue Clinic. On September 6, 2019, Barakat purportedly issued a prescription for a CTU and a separate prescription for an ultrasound device, which did not identify the length of time for the rentals, and ultrasound patches that were provided to the Defendants, despite AB not treating with Far Rockaway Medical on that day.

(ix)    On October 23, 2019, an Insured named RT was purportedly involved in a motor vehicle accident. Thereafter, on November 18, 2019, RT treated with Barakat at Bronx County Medical Care at the Boston Road Clinic. On November 26, 2019, Barakat purportedly issued a 28-day prescription for a CTU and a separate 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants, despite RT not treating with Bronx County Medical Care on that day.

(x)     On November 18, 2019, an Insured named MS was purportedly involved in a motor vehicle accident. Thereafter on November 25, 2019, MS treated with Barakat at Bronx County Medical Care at the Boston Road Clinic. On December 4, 2019, Barakat purportedly issued a 28-day prescription for a CTU and a 28-day prescription for an ultrasound device and ultrasound patches that were provided to the Defendants, despite MS not treating with Bronx County Medical on that day.

124.    These are only representative examples. In fact, virtually all the Insureds identified in Exhibit "1" that were purportedly issued prescriptions by Barakat received prescriptions that are identical to the ones identified above.

125.    In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were medically unnecessary and issued as part of predetermined fraudulent protocols, the prescriptions used by the Defendants to bill GEICO contained inauthentic signatures by Barakat that involved a typed signatures identifying Barakat's name without any date/time stamp or other indication of an authentic electronic signature.

126.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were issued pursuant to a predetermined fraudulent protocol, the prescriptions obtained by the Defendants that were purportedly issued by Barakat were frequently issued on days that Barakat did not treat the Insureds.

127.    Similarly, many of the prescriptions that were used by the Defendants to support the charges identified in Exhibit "1" were purportedly issued by Anam Azeem M.D. ("Azeem") or Olanrewaju Adeosun, M.D. ("Adeosun"), which also virtually always prescribed a CTU rental and/or an ultrasound unit with ultrasound patches.

128.    For example:

    (i)    On September 11, 2018, an Insured named FA was purportedly involved in a motor vehicle accident. Thereafter, on September 27, 2018, FA treated with Azeem through Citimedical, P.C. ("Citimedical") at the 92-18 165th Street, Jamaica (the "165th Street Clinic"), and Azeem purportedly issued a 28-day prescription for a CTU and CTU Wrap that was provided to the Defendants.

    (ii)    On October 17, 2018, an Insured named SS was purportedly involved in a motor vehicle accident. Thereafter, on October 31, 2018, SS treated with Azeem through Citimedical at 910 East Gun Hill Road, Bronx (the "East

Gun Hill Road Clinic"), and Azeem purportedly issued a 28-day prescription for a CTU and CTU Wrap that was provided to the Defendants.

(iii)   On November 12, 2018, an Insured named GD was purportedly involved in a motor vehicle accident. Thereafter, on January 14, 2019, GD treated with Azeem through Citimedical at the 6555 Woodhaven Boulevard, Rego Park (the "Woodhaven Boulevard Clinic"), and Azeem purportedly issued a 56-day prescription for an ultrasound device with ultrasound patches that was provided to the Defendants.

(iv)   On February 7, 2019, an Insured named MR was purportedly involved in a motor vehicle accident. Thereafter, on July 8, 2019, MR treated with Azeem through Citimedical at the Woodhaven Boulevard Clinic, and Azeem purportedly issued a 56-day prescription for an ultrasound device with ultrasound patches that was provided to the Defendants.

(v)   On April 15, 2019, an Insured named GC was purportedly involved in a motor vehicle accident. Thereafter, on May 2, 2019, GC treated with Adeosum through Citimedical at the 55 Greene Avenue, Brooklyn (the "Greene Avenue Clinic"), and Adeosum purportedly issued a 28-day prescription for an ultrasound device with ultrasound patches that was provided to the Defendants.

(vi)   On April 28, 2018, an Insured named PC was purportedly involved in a motor vehicle accident. Thereafter, on June 6, 2018, PC treated with Azeem through Citimedical at the East Gun Hill Road Clinic, and Azeem purportedly issued a 56-day prescription for an ultrasound device with ultrasound patches that was provided to the Defendants.

(vii)   On July 7, 2018, an Insured named KG was purportedly involved in a motor vehicle accident. Thereafter, on August 10, 2018, KG treated with Azeem through Citimedical at the East Gun Hill Road Clinic, and Azeem purportedly issued a 28-day prescription for a CTU and CTU Wrap that was provided to the Defendants.

(viii)   On July 12, 2021, an Insured named RG was purportedly involved in a motor vehicle accident. Thereafter, on July 31, 2019, RS treated with Azeem through Citimedical at the Greene Avenue Clinic, and Azeem purportedly issued a 28-day prescription for a CTU and CTU Wrap that was provided to the Defendants.

(ix)   On July 25, 2019, an Insured named JJ was purportedly involved in a motor vehicle accident. Thereafter, on September 4, 2019, JJ treated with Azeem through Citimedical at the East Gun Hill Road Clinic, and Azeem purportedly issued a 28-day prescription for a CTU and CTU Wrap that was provided to the Defendants.

> (x)    On October 23, 2019, an Insured named MM was purportedly involved in a motor vehicle accident. Thereafter, on October 28, 2019, MM treated with Azeem through Citimedical at the Woodhaven Boulevard Clinic, and Azeem purportedly issued a 28-day prescription for a CTU and CTU Wrap that was provided to the Defendants.

129.    These are only representative examples. In fact, virtually all of the Insureds identified in Exhibit "1" that were purportedly issued prescriptions by Azeem and Adeosun received prescriptions that are identical to the ones identified above.

130.    In keeping with the fact that the prescriptions issued by Prescribing Practitioners, including Barakat, Azeem, and Adeosun, to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the Fraudulent Equipment prescribed did not provide any medical benefit to Insureds as the Insureds could completely recover full range of motion with limited physical therapy after their low impact automobile accidents.

131.    Indeed, the Prescribing Practitioners, including Barakat, Azeem, and Adeosun, virtually always prescribed CTUs during Insureds treatments at Clinics when there was no objective evidence that the Insureds were unable to use an ice pack or hot pack, and when Insureds were also actively undergoing physical therapy.

132.    Even if there were a medically necessary reason for issuing CTUs to the Insureds identified in Exhibit "1" the manner in which Prescribing Practitioners, including Barakat, Azeem, and Adeosun, prescribed CTUs were medically unnecessary because the CTU's were virtually always prescribed for multiple weeks when CTUs are only helpful, in lieu of an ice pack, for the first 48 hours after injury.

133.    In addition, and in keeping with the fact that the Fraudulent Equipment was medically unnecessary and dispensed pursuant to predetermined fraudulent protocols, the

Defendants frequently purportedly to dispense Fraudulent Equipment to Insureds several weeks, or even months, after the Fraudulent Equipment was prescribed.

134.    For example:

(i)     On April 28, 2018, an Insured named PC was purportedly involved in a motor vehicle accident. Thereafter, on June 6, 2018, PC treated with Azeem through Citimedical at the East Gun Hill Road Clinic, and Azeem purportedly issued a 56-day prescription for an ultrasound unit and ultrasound patches to PC. However, Gevorina only dispensed the ultrasound unit and ultrasound patches on August 20, 2018, 75 days after they were purportedly prescribed.

(ii)    On May 14, 2018, an Insured named JM was purportedly involved in a motor vehicle accident. Thereafter, on May 31, 2018 JM treated with Adeosun through Citimedical at the Greene Avenue Clinic, and Adeosun purportedly issued a 28-day prescription for a CTU and a 28-day prescription for an ultrasound unit and ultrasound patches. However, Gevorina only dispensed the CTU, ultrasound unit, and ultrasound patches on July 10, 2018, 40 days after they were purportedly prescribed.

(iii)   On May 14, 2018, an Insured named CP was purportedly involved in a motor vehicle accident. Thereafter, on May 31, 2018 CP treated with Adeosun through Citimedical at the Greene Avenue Clinic, and Adeosun issued a 28-day prescription for a CTU and a 28-day prescription for an ultrasound unit and ultrasound patches. However, Gevorina only dispensed the CTU, ultrasound unit, and ultrasound patches on July 10, 2018, 40 days after they were purportedly prescribed.

(iv)    On November 12, 2018, an Insured named GD was purportedly involved in a motor vehicle accident. Thereafter on January 14, 2019, GD treated with Azeem through Citimedical at the Woodhaven Boulevard Clinic, and Azeem purportedly issued a 56-day prescription for an ultrasound unit and ultrasound patches. However, Gevorina only dispensed the ultrasound unit and ultrasound patches on March 25, 2019, 70 days after they were purportedly prescribed.

(v)     On November 30, 2018, an Insured named AK was purportedly involved in a motor vehicle accident. Thereafter, on January 4, 2019, AK treated with Azeem through Citimedical at the East Gun Hill Road Clinic, and Azeem purportedly issued a 56-day prescription for an ultrasound unit and ultrasound patches. However, Gevorina only dispensed the ultrasound unit and ultrasound patches on March 13, 2019, 68 days after they were purportedly prescribed.

(vi)    On January 27, 2019, an Insured named JRM was purportedly involved in a motor vehicle accident. Thereafter, on January 30, 2019, JRM treated with Adeosun through Citimedical at the 165th Street Clinic, and Adeosun purportedly issued a 28-day prescription for a CTU and a prescription for an ultrasound unit and ultrasound patches. However, Gevorina only dispensed the CTU, ultrasound unit, and ultrasound patches on March 11, 2019, 40 days after they were purportedly prescribed.

(vii)    On January 29, 2019, an Insured named TG was purportedly involved in a motor vehicle accident. Thereafter, on February 5, 2019 TG treated with Barakat through Bronx County Medical at the Boston Road Clinic with Dr. Barakat. Thereafter, on June 5, 2019, Barakat purportedly issued a 28-day prescription for an ultrasound unit as well as ultrasound patches and a 14-day prescription for a CTU. However, Gevorina dispensed the CTU, ultrasound unit, and ultrasound patches on July 23, 2019, 48 days after they were purportedly prescribed.

(viii)    On May 7, 2019 an Insured named JB was purportedly involved in a motor vehicle accident. Thereafter, on May 8, 2019, JB treated with Barakat through Bronx County Medical at the Boston Road Clinic, and Barakat issued a 28-day prescription for an ultrasound unit as well as patches and a 14-day prescription for a CTU. However, Gevorina only dispensed the ultrasound unit, ultrasound patches, and CTU on August 5, 2019, 56 days after they were purportedly prescribed.

(ix)    On July 17, 2019, an Insured named JG was purportedly involved in a motor vehicle accident. Thereafter, on August 6, 2019, JG treated with Barakat through Bronx County Medical at 4014A Boston Road. Thereafter, on August 14, 2019, Barakat issued a 28-day prescription for a CTU, and a separate prescription for an ultrasound device and ultrasound patches, despite Barakat not treating JG on that date. However, Gevorina only dispensed the CTU, ultrasound device, and ultrasound patches on September 10, 2019, 22 days after they were purportedly prescribed.

(x)    On August 12, 2019 an Insured named WC was purportedly involved in a motor vehicle accident. Thereafter, on August 15, 2019, WC sought treatment with Barakat through Far Rockaway Medical at the Metropolitan Avenue Clinic, and Barakat issued a 14-day prescription for a CTU, and a 28-day prescription for an ultrasound device and ultrasound patches. However, Gevorina only dispensed the CTU, ultrasound device, and ultrasound patches on September 16, 2019, 32 days after they were purportedly prescribed.

135.    These are only representative examples.  In many of the claims identified in Exhibit "1", the Fraudulent Equipment was dispensed weeks, or even months, after the date the prescription for Fraudulent Equipment.

136.    Additionally, and in further support of the fact that the prescriptions for Fraudulent Equipment were issued pursuant to predetermined protocols, the Prescribing Practitioners often failed to fill in critical information on the template prescription forms, including, including how many times per day the CTU or ultrasound units should be used, how long each session should be, and on what settings the devices should be used. Nevertheless, the Defendants dispensed the Fraudulent Equipment.

137.    In each of the claims identified in Exhibit "1" based upon prescriptions that originated from Clinics, the Defendants falsely represented that Fraudulent Equipment were dispensed pursuant to prescriptions from healthcare providers for medically necessary DME/OD, and were therefore eligible to collect No-Fault Benefits, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants.

### 2)    The Fraudulent Protocol Following Arthroscopic Surgery

138.    In addition to the Defendants' unlawful financial arrangements, virtually all the Insureds identified in Exhibit "1" that were issued prescriptions for Fraudulent Equipment following arthroscopic surgical procedures were issued virtually identical prescriptions for Fraudulent Equipment pursuant to predetermined fraudulent protocols with others at the Surgery Centers that were designed to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

139.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set forth between the Defendants and John Doe Defendants who were associated with the Surgery Centers and Prescribing Practitioners, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

140.    In a legitimate setting, when a patient undergoes a minimally invasive surgery, the surgeon should evaluate the patient's individual circumstances to determine a specific course of post-surgical rehabilitation.

141.    Furthermore, in a legitimate post-surgical setting, a healthcare provider may prescribe DME and/or OD to the extent that it will aid in the patient's recovery.  In determining whether to prescribe DME and/or OD in a legitimate post-surgical setting – a healthcare provider should evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing physical therapy; (iii) whether the DME and/or OD is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual presentation for post-surgical recovery, and these decisions would be documented in a contemporaneous medical record.

142.    In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" that were issued after arthroscopic surgeries were part of a predetermined fraudulent protocol, virtually all the Insureds who underwent an arthroscopic surgical procedure purportedly received a medically unnecessary DVT Device.

143.     In addition, a vast majority of the Insureds identified in Exhibit "1" who underwent an arthroscopic surgical procedure purportedly received a CTU and/or an ultrasound unit together with ultrasound patches, none of which were medically necessary.

144.     It is extremely improbable – to the point of impossibility – that the vast majority of Insureds identified in Exhibit "1" who underwent minimally invasive surgical procedures would ultimately receive the same post-surgical treatment including prescriptions for the same items of Fraudulent Equipment despite being differently situated.

145.     A substantial number of Insureds receiving virtually identical prescriptions for Fraudulent Equipment would, by extension, mean that all those Insureds had identical presentations for post-surgical recovery.

146.     In keeping with the fact that the prescriptions for Fraudulent Equipment were medically unnecessary and issued as part of a predetermined fraudulent protocol to Insureds after arthroscopic surgery, the medical reports by the Prescribing Practitioners did not identity or explain the need for issuing the Fraudulent Equipment after surgery.

147.     For example, although virtually all the Insureds identified in Exhibit "1" that underwent arthroscopic surgery were prescribed DVT Devices, the prescription or necessity of the DVT Devices were not referenced in any medical records authored by the Prescribing Practitioner.

148.     A DVT Device is used to mitigate a patient's risk for suffering from deep vein thrombosis ("DVT") after a surgical procedure by compressing air to a limb, such as a leg or arm, in order to create blood flow. DVT is when there is a blood clot in a vein, which can lead to potentially life-threatening circumstances if the blood clot travels to the heart, *i.e.* a pulmonary embolism. The purpose of the DVT Device is to create blood flow in a limb when the patient is

unlikely to be able to do it on his or her own because they have difficulty ambulating after a surgery.

149.    Not all patients who undergo surgical procedures are at a real risk for DVT. There are many factors that play a risk into whether a patient is at risk for DVT, thus necessitating the use of a DVT Device. For example: (i) the ability to be ambulatory; (ii) family medical history; (iii) history of smoking, heart-disease, or cancer; (iv) obesity; (v) age; and (vi) the type of surgical procedure.

150.    In a legitimate setting, physicians must assess each patient's risk factor for DVT and determine whether they are in the category of a high risk, moderate risk, or low risk for DVT.

151.    There are certain surgical procedures that automatically increase the risk for DVT. For example, a total knee replacement, or a total hip replacement will automatically cause patients to be in a higher-risk category because of the length of time during the recovery that the patient is not ambulatory.

152.    By contrast, arthroscopic knee surgeries are at a low-risk for DVT due to the typical post-surgical recovery, and because the surgery is being performed on an out-patient basis with the patient being ambulatory immediately following the procedure.

153.    Furthermore, surgical procedures of the upper body, especially the shoulder, also pose a low-risk for developing DVT. Even more, arthroscopic shoulder surgeries pose an extremely low-risk for developing DVT.

154.    In circumstances where a patient underwent an arthroscopic surgery of a knee, a physician would only legitimately prescribe a DVT Device to aid in preventing DVT if the patient has multiple other factors that significantly increase their risk for DVT, which would need to be documented by the surgeon in a contemporaneous medical record.

155.    In keeping with the fact that the prescriptions for DVT Devices issued to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" who were prescribed DVT Devices post-operatively were virtually always low risk for developing DVT after their surgical procedures as they were ambulatory after their surgeries.

156.    Moreover, and keeping with the fact that the prescriptions for DVT Devices were not medically necessary, virtually all of the Insureds identified in Exhibit "1" who purportedly received a DVT Device from the Defendants simultaneously were not at risk of developing a DVT because they were ambulatory and underwent physical therapy immediately after the arthroscopic surgery.

157.    Furthermore, and in keeping with the fact that the prescriptions for DVT Devices were issued pursuant to a predetermined treatment protocol without regard for medical necessity, the Prescribing Practitioners virtually never screened Insureds to assess their risk for developing a DVT that would warrant the prescription of a DVT Device.

158.    To the extent that the Insureds identified in Exhibit "1" were legitimately assessed for the risk for developing a DVT, the assessment revealed either that the Insureds had no risk or had a low risk for developing a DVT, neither of which would necessitate the prescribing of a DVT.

159.    In addition, all of the CTUs prescribed to the Insureds identified in Exhibit "1" after arthroscopic surgeries were not medically necessary because they exceeded medical utility and did not comport with generally accepted medical guidelines.

160.    The CTUs prescribed to the Insureds identified in Exhibit "1" after arthroscopic surgery primarily functioned as the equivalent of an ice-pack with a compression bandage to the part of the body that underwent surgery.

161.    However, and in keeping with the fact that the prescriptions for CTUs after arthroscopic surgery were not medically necessary, the Prescribing Practitioners did not contemporaneously document in the medical records explaining why the CTUs were medically necessary or even indicate that the Insureds could not use an ice-pack or a compression bandage following their ambulatory surgery necessitating the prescription for a CTU.

162.    Moreover, the use of cold-therapy – either in the form of an ice pack or a CTU – for post-operative patients to decrease swelling, including patients who undergo minimally invasive procedures such as arthroscopic surgery, is only effective during the first 48 hours after surgery.

163.    After the first 48 hours, cold-therapy is only helpful to post-arthroscopic surgery patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cold-therapy is typically provided by the physical therapist in the form of ice packs.

164.    It is improbable that a legitimate healthcare provider would issue a prescription for a CTU to a patient post-arthroscopic surgery – let alone for multiple weeks of use – when that patient is able to use ice-packs.

165.    It is even more improbable – to the point of impossibility – that a legitimate healthcare providers would issue a prescription for a CTU to a patient post-arthroscopic surgery for multiple weeks of use when that patient was simultaneously directed to undergo physical therapy.

166.    However, and also in keeping with the fact that the prescriptions for CTUs after arthroscopic surgery were medically unnecessary, virtually all CTUs purportedly dispensed to the Insureds identified in Exhibit "1" after arthroscopic surgeries were based upon prescriptions

purportedly issued by the Prescribing Practitioners that directed the rental of CTUs for weeks at a time when, if necessary, CTUs would only be needed for the first 48 hours.

167.    Furthermore, the ultrasound units that were prescribed and issued to the Insureds identified in Exhibit "1" after arthroscopic surgeries were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

168.    No legitimate healthcare provider would issue an ultrasound unit to a patient following an arthroscopic surgery as part of a home rehabilitation regimen.

169.    In keeping with the fact that the ultrasound units issued to Insureds in Exhibit "1" following arthroscopic surgery were medically unnecessary and part of a predetermined treatment protocol, the Prescribing Practitioners virtually never documented in contemporaneous medical records that ultrasound units were being prescribed to Insureds or explain the need for the prescription.

170.    All of the prescriptions for Fraudulent Equipment after arthroscopic surgeries were not medically necessary and part of predetermined fraudulent protocols because the Insureds were always advised to – and virtually always did – undergo physical therapy after the arthroscopic surgeries.

171.    The post-surgical Fraudulent Equipment dispensed by the Defendants was completely unnecessary given the nature of the procedures, the physical capabilities of the Insureds, the lack of medical documentation and the prompt physical therapy treatments that the Insureds typically underwent. In the context of post-operative treatment for minimally invasive procedures, especially arthroscopic procedures, no legitimate physician acting in each patient's

best interest would prescribe the Fraudulent Equipment when the patients were able to – and ultimately did – undergo physical therapy at the same time.

172.   Despite the lack of medical necessity, the Defendants were able to obtain medically unnecessary prescriptions for Fraudulent Equipment issued after arthroscopic surgeries due to the secret agreements with the John Doe Defendants who are associated with the Surgery Centers and the Prescribing Practitioners who performed the arthroscopic surgeries.

173.   For example, as a result of the secret agreements, the Defendants were able to obtain medically unnecessary prescriptions for Fraudulent Equipment purportedly issued by Laxmidhar Diwan, M.D. ("Diwan") and Jeffrey Guttman, M.D. ("Guttman") after they performed minimally invasive arthroscopic surgeries on Insureds, which the Defendants used to support the many of charges identified in Exhibit "1".

174.   Subsequent to their involvement in minor "fender-bender" motor vehicle accidents many of the Insureds in Exhibit "1" underwent minimally invasive arthroscopic surgery on a shoulder or knee joint by Diwan or Guttman.

175.   Virtually every Insured identified in Exhibit "1" who treated with Diwan or Guttman was issued a medically unnecessary prescription for a CTU, DVT Device, and/or ultrasound device with ultrasound patches after undergoing a minor arthroscopic procedure.

176.   In keeping with the fact that the prescriptions purportedly issued by Diwan and Guttman to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions for Fraudulent Equipment were written without evaluating each Insured's individual post-surgical presentation to determine whether and what type of DME was medically necessary for the Insured's post-surgical recovery.

177.   Furthermore, the prescriptions were issued by Diwan and Guttman regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective post-operative complaints, or whether each patient would actually use the Fraudulent Equipment.

178.   In virtually all cases, the prescriptions for Fraudulent Equipment by Diwan and Guttman to the Insureds identified in Exhibit "1" were issued and provided to the Defendants based upon predetermined fraudulent protocols and secret agreements.

179.   For example:

   (i)   On September 15, 2018, an Insured named TO was allegedly involved in a motor vehicle accident. On December 17, 2018, Diwan performed arthroscopic surgery on TO's right knee at an out-patient Surgery Center. On the same day as the surgery, Diwan purportedly issued three separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; (ii) CTU; and (iii) an ultrasound device with ultrasound patches. Diwan purportedly issued these prescriptions to TO despite TO being ambulatory and that Diwan's surgical record only identifies prescribing "a continuous passive motion machine and a cooling machine".

   (ii)   On October 19, 2018, an Insured named PA was allegedly involved in a motor vehicle accident. On December 17, 2018, Diwan performed arthroscopic surgery on PA's left knee at an out-patient Surgery Center. On the same day as the surgery, Diwan purportedly issued three separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; (ii) CTU; and (iii) an ultrasound device with ultrasound patches. Diwan purportedly issued these prescriptions to PA despite PA being ambulatory and that Diwan's surgical record only identifies prescribing "a continuous passive motion machine and a cooling machine".

   (iii)   On October 24, 2018, an Insured named TC was allegedly involved in a motor vehicle accident. On April 22, 2019, Guttman performed arthroscopic surgery on TC's right shoulder at an out-patient Surgery Center. On the same day as the surgery, Guttman purportedly issued two separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; and (ii) a CTU. Guttman purportedly issued these prescriptions to TC despite TC being ambulatory and Guttman's surgical records not referencing any of the prescriptions.

(iv) On January 10, 2019, an Insured named JA was allegedly involved in a motor vehicle accident. On March 4, 2019, Diwan performed arthroscopic surgery on JA's right knee at an out-patient Surgery Center. On the same day as the surgery, Diwan purportedly issued three separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; (ii) CTU; and (iii) an ultrasound device with ultrasound patches. Diwan purportedly issued these prescriptions to JA despite JA being ambulatory and that Diwan's surgical record only identifies prescribing "a continuous passive motion machine and a cooling machine".

(v) On February 9, 2019, an Insured named WH was allegedly involved in a motor vehicle accident. On April 15, 2019, Guttman performed arthroscopic surgery on WH's left shoulder at an out-patient Surgery Center. On the same date as the surgery, Guttman purportedly issued a prescription for a DVT Device that was provided to the Defendants despite MH being ambulatory and Guttman's surgical record not referencing the prescription.

(vi) On February 11, 2019, an Insured named AA was allegedly involved in a motor vehicle accident. On June 22, 2019, Guttman performed arthroscopic surgery on AA's right knee at an out-patient Surgery Center. On the same day as the surgery, Guttman purportedly issued two separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; and (ii) a CTU. Guttman purportedly issued these prescriptions to AA despite AA being ambulatory and Guttman's surgical records not referencing any of the prescriptions.

(vii) On April 24, 2019, an Insured named AK was allegedly involved in a motor vehicle accident. On June 17, 2019, Guttman performed arthroscopic surgery on AK's right knee shoulder at an out-patient Surgery Center. On the same date as the surgery, Guttman issued AK two separate prescriptions that were provided to the Defendants, including for: (i) a DVT device; and (ii) a CTU. On January 13, 2020, Guttman performed arthroscopic surgery on AK's left shoulder at an out-patient Surgery Center. On the same date as the left shoulder surgery, Guttman issued AK a prescription for a DVT Device that was provided to the Defendants. All of these prescriptions were issued to AK despite AK being ambulatory and Guttman's surgical records not referencing any of the prescriptions.

(viii) On May 28, 2019, an Insured named TB was allegedly involved in a motor vehicle accident. On September 23, 2019, Diwan performed arthroscopic surgery on TB's right shoulder at an out-patient Surgery Center. On the same day as the surgery, Diwan purportedly issued two separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; and (ii) a CTU. Diwan purportedly issued these prescriptions to TB despite TB being ambulatory and that Diwan's surgical

record only identifies prescribing "a continuous passive motion machine and a cooling machine".

(ix)    On May 30, 2019, an Insured named RC was allegedly involved in a motor vehicle accident. On September 9, 2019, Guttman performed arthroscopic surgery on RC's right shoulder at an out-patient Surgery Center. On the same day as the surgery, Guttman purportedly issued two separate prescriptions for DME that were provided to Defendants, which identified: (i) a DVT Device; and (ii) a CTU. Guttman purportedly issued these prescriptions to AA despite AA being ambulatory and Guttman's surgical records not referencing any of the prescriptions.

(x)    On July 30, 2019, an insured named EA was allegedly involved in a motor vehicle accident.  On January 6, 2020, Guttman performed arthroscopic surgery to EA's right shoulder at an out-patient Surgery Center. On the same date as the surgery, Guttman purportedly issued a prescription for a DVT Device that was provided to the Defendants despite EA being ambulatory and Guttman's surgical record not referencing the prescription.

180.    These are only representative examples. In fact, virtually all of the Insureds identified in Exhibit "1" that underwent surgeries performed by Diwan or Guttman were purportedly issued prescriptions for a CTU, DVT Device, and/or ultrasound device with ultrasound patches that were provided to the Defendants despite the Insureds being ambulatory immediately after surgery and when the absence of any identification or explanation in the Insureds' medical records justifying the prescription of the specific Fraudulent Equipment identified on the prescriptions used by the Defendants to bill GEICO.

181.    In keeping with the fact that the prescriptions issued by Diwan and Guttman to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, many of the prescriptions that were used by the Defendants to bill GEICO for Fraudulent Equipment contained a photocopied or stamped signature of the Prescribing Practitioner.

182.    Even more, and in keeping with the fact that the prescriptions issued by Diwan and Guttman were not medically necessary and provided pursuant to a predetermined fraudulent

protocol, the Fraudulent Equipment purportedly prescribed did not provide any medical benefit to the Insureds as the Insureds could completely recover full range of motion with limited physical therapy after their minimally invasive procedures, and were directed to undergo physical therapy after their arthroscopic surgeries.

183. In each of the claims for Fraudulent Equipment identified in Exhibit "1" that was based upon prescriptions issued after arthroscopic surgery, the Defendants falsely represented that Fraudulent Equipment were provided pursuant to prescriptions from healthcare providers for medically necessary DME, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants.

**D. The Defendants' Fraudulent Billing**

184. In addition to the fraudulent scheme to submit bills for prescriptions that were based upon unlawful financial arrangements and medically unnecessary prescriptions that were based upon predetermined fraudulent protocols, the bills submitted to GEICO by the Defendants misrepresented what was provided to the Insureds and, to the extent that any Fraudulent Equipment was provided, that the charges for Fraudulent Equipment were for permissible reimbursement rates, when they were not.

185. When the Defendants' submitted bills to GEICO for DME and/or OD that they sold to the Insureds, the Defendants requested reimbursement rates that were based upon the specific Fraudulent Equipment purportedly provided to the Insureds based upon the HCPCS Codes contained on the bills.

186. However, in each of the claims identified in Exhibit "1", the Defendants knowingly misrepresented the reimbursement to which they were entitled because they: (i) billed for

DME/OD that they did not provide; (ii) to the extent that they provided any Non-Fee Schedule items, they billed for Non-Fee Schedule items and requested reimbursement at rates that far exceeded the reimbursement standard; and/or (iii) to the extent that they provided any Fee Schedule items, they billed GEICO using HCPCS Codes that did not apply to the items actually provided. All of this was done to fraudulently inflate the reimbursement that the Defendants could obtain.

187.    As indicated above, under the No-Fault Laws, selling Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

188.    By submitting bills to GEICO for selling Non-Fee Schedule items, the Defendants represented that they provided that specific equipment and that the reimbursement amounts requested were the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

189.    However, in virtually all of the charges to GEICO identified in Exhibit "1" for selling Non-Fee Schedule items, the Defendants fraudulently misrepresented to GEICO that they provided the specific equipment and that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

190.    In keeping with the fact that the Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

191.    The Defendants did not include invoices showing their legitimate cost to acquire the Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

192.    In keeping with the fact that the Defendants submitted bills to GEICO that fraudulently misrepresented they provided specific Non-Fee Schedule items and that the amounts sought were permissible, it was improbable – to the point of impossibility - for the Defendants to provide Insureds with the DVT Devices identified in the bills to GEICO at the rates identified to GEICO.

193.    Whenever the Defendants billed GEICO for a DVT Device, they billed GEICO a total of $985.55 for selling a "VenaFlow Pneumatic Appliance with wraps" using HCPCS Code E0676, which is a Non-Fee Schedule item thereby representing to GEICO that they provided the VenaFlow devices to Insureds and were entitled to reimbursement of $985.55, which was less than or equal to the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

194.    The DVT Devices purportedly billed by the Defendants, i.e. the VenaFlow pneumatic devices, are available for purchase between $2,200.00 and $2,800.00 per unit. However, despite the actual cost for a VenaFlow device, the Defendants billed GEICO seeking reimbursement of $985.55 for each unit that they allegedly sold to an Insured, which means that the Defendants lost at least $1,000.00 on each device that the sold to an Insured.

195.    No legitimate DME/OD supplier would sell DVT Devices or other equipment to individuals and bill insurance companies at a loss of $1,000.00 or more per unit. Even more, no

DME/OD supplier would continuously sell hundreds of DVT Devices to individuals at a $1,000.00 loss per unit.

196.    According to GEICO's records, the Defendants purporting to sell DVT Devices to approximately 600 different Insureds, which if true, would be the equivalent of a more than $600,000.00 loss.

197.    In reality, the Defendants to the extent that they provided the Insureds with any item, did not sell VenaFlow devices to the Insureds.

198.    In every charge by the Defendants to GEICO for purportedly selling a DVT Device to an Insured, including all of the charges identified in Exhibit "1" under HCPCS Code E0676, the Defendants misrepresented that they sold VenaFlow devices to the Insureds and were entitled to $985.55 per unit from GEICO, when they did not actually sell such devices to each Insured and were not entitled to reimbursement of No-Fault benefits.

199.    Similarly, the Defendants misrepresented the charges to GEICO for all of the ultrasound patches that they purportedly sold to the Insureds identified in Exhibit "1", in conjunction with renting the ultrasound device to Insureds.

200.    Whenever the Defendants billed GEICO for ultrasound patches, they billed GEICO the equivalent of $74.25 per unit for selling an ultrasound patch for a "PainShield" ultrasound unit using HCPCS Code A9999, which is a Non-Fee Schedule item thereby representing to GEICO that they provided the ultrasound patches to Insureds and were entitled to reimbursement of $74.25 per unit, which was less than or equal to the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

201.    Pursuant to PainShield's instruction manual – the ultrasound patches for the PainShield that Defendants purportedly provided to Insureds were reusable patches, not one-time

disposable patches as represented by the Defendants. Additionally, GEICO's revealed that the Defendants only purchased 30 packs of ultrasound patches, which was the equivalent of 300 reusable patches.

202.   In keeping with the fact that the charges to GEICO for the ultrasound patches were for items never actually provided to Insureds, Defendants billed GEICO for purportedly providing more than 3,000 ultrasound patches to over 175 different Insureds when  the Defendants only purchased about 300 patches.

203.   In addition, the Defendants billed GEICO for purportedly providing ultrasound patches incidental to renting ultrasound devices when they were not legally permitted to submit separate charges for accessories related to a rental device. As explained in the New York State Medicaid Procedure Manual, the monthly rental charge for DME includes "all necessary equipment."

204.   Accordingly, each of the bills submitted by Defendants to GEICO fraudulently misrepresented that (i) multiple ultrasound patches were provided to each Insured and (ii) they were entitled to reimbursement for each ultrasound patch when, in fact, the cost of the patches was incorporated into the daily rental reimbursement rate for the ultrasound devices.

205.   In addition to misrepresenting the permissible reimbursement rates for the Fraudulent Equipment sold to Insureds, the Defendants submitted bills to GEICO that misrepresented the permissible reimbursement rates for renting Fraudulent Equipment.

206.   As stated above, the New York Fee Schedule sets forth a maximum permissible rental charge, on a monthly basis, for renting equipment, supplies and services. For Fee Schedule items, the total monthly rental charges for equipment, supplies, and services, is no greater than 10% of the listed maximum reimbursement amount or 10% of the DME/OD supplier's actual

acquisition cost. For Non-Fee Schedule items, which includes the Fraudulent Equipment, the total monthly rental charges for equipment, supplies, and services is no greater than the average monthly cost to the general public.

207.    Here, virtually all of the items that the Defendants purportedly rented to the Insureds identified in Exhibit "1" were billed using HCPCS Code E1399, which is a Fee Schedule item that does not have a specific reimbursement rate. Accordingly, the Defendants were only entitled to receive the equivalent of 10% of their legitimate acquisition cost for renting DME to Insureds for a one-month period.

208.    When the Defendants submitted bills to GEICO seeking payment for the Fraudulent Equipment, which included CTUs and ultrasound units both billed under HCPCS Code E1399, the Defendants fraudulently misrepresented that the charges were within the maximum permissible amount.

209.    As demonstrated by the charges identified in Exhibit "1", the Defendants submitted bills to GEICO for the rental of CTUs for periods between two and four weeks at a rate of $115.20 per day, resulting in charges between $1,612.80 and $3,225.60 per Insured.

210.    The charges submitted by the Defendants misrepresented the maximum reimbursement amount for the rental of CTUs as the Defendants' acquisition costs were only a fraction of what was charged to GEICO.

211.    However, each of the charges submitted by the Defendants for CTUs, under HCPCS Codes E1399, misrepresented the maximum reimbursement amount for the rental of CTUs as the cost to the public for the same type of device was only a fraction of what was charged to GEICO.

212.    In fact, the CTUs purportedly provided by the Defendants to the Insureds identified in Exhibit "1" was either a "Cold Rush" by Ossur, which was available for purchase online for $149.99 or a "Squid Go Active Cold Compression Device" by Patterson Medical, which is available for purchase online for $452.99.

213.    As such the maximum <u>monthly</u> reimbursement charge for the rental of CTUs was no greater than one-tenth of the Defendants' acquisition cost, which was between $14.99 and $45.29 (or $.49 and $1.50 per day respectively) based upon the brand purportedly provided to the Insureds. By contrast, the Defendants charged GEICO $115.20 per <u>day</u> for each CTU purportedly rented to each Insured.

214.    Accordingly, each of the bills submitted by the Defendants to GEICO for a CTU misrepresented that they were providing CTUs to the Insureds and were entitled to obtain the equivalent of $115.20 per day when, if medically necessary, the Defendants were only entitled to a daily rental reimbursement between $0.49 and $1.50.

215.    Similarly, the charges submitted by the Defendants misrepresented the maximum reimbursement amount for the rental of ultrasound devices because the Defendants' acquisition costs were only a fraction of what was charged to GEICO.

216.    In fact, the Defendants purchased ultrasound units, entitled PainShield, for $1,395.00 per unit.

217.    As such the maximum <u>monthly</u> reimbursement charge for the rental of ultrasound units was no greater than one-tenth of the Defendants' acquisition cost, which was $139.50. By contrast, the Defendants charged GEICO $25.24 per <u>day</u> for each ultrasound device purportedly rented to each Insured.

218.   Accordingly, each of the bills submitted by the Defendants to GEICO for an ultrasound unit fraudulently misrepresented that they were providing ultrasound devices to the Insureds and were entitled to obtain $25.24 per <u>day</u> when, if medically necessary, the Defendants were entitled to a rental reimbursement that was no greater than $139.50 per month, or $4.65 per day, if medically necessary.

219.   In each of the claims identified within Exhibit "1", the Defendants fraudulently misrepresented in the bills submitted to GEICO that they provided the specific billed for Fraudulent Equipment and that the charges for the Fraudulent Equipment were less than or equal to the maximum reimbursement amount for each item. Instead, the Defendants purposefully billed GEICO for items not provided and at rates above the maximum reimbursement amounts in order to maximize the amount of No-Fault Benefits they could obtain from GEICO, and, thus, was not eligible for reimbursement of No-Fault Benefits.

**III.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

220.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or medical reports to GEICO through and in the name of the Defendants, seeking payment for the Fraudulent Equipment.

221.   The NF-3 forms, HCFA-1500 forms, and medical reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

    (i)    The NF-3 forms, HCFA-1500 forms, prescriptions, and medical records uniformly misrepresented to GEICO that Gevorina provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, Gevorina was not entitled to

receive No-Fault Benefits because, to the extent that  provided any of the Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable but are associated with the Clinics and Surgical Centers, including the Prescribing Practitioners; and (b) predetermined fraudulent protocols without regard for the medical necessity of the items

(ii)   The NF-3 forms, HCFA-1500 forms, prescriptions, and medical records uniformly misrepresented to GEICO that Gevorina actually provided the Insureds with the Fraudulent Equipment identified in the bills, that the reimbursement rates identified in the bill were permissible, and were eligible to receive No-Fault Benefits. In fact, Gevorina were not entitled to receive No-Fault Benefits because – to the extent any Fraudulent Equipment was provided – the bills falsified what was provided to the Insureds, and that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for the Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, prescriptions, and medical records.

## IV.   **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

222.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

223.   To induce GEICO to promptly pay the fraudulent charges the Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

224.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the unlawful financial arrangements that formed the basis for the prescriptions for the Fraudulent Equipment that were provided to the Defendants and ultimately used as the basis to submit bills to GEICO, in order to prevent GEICO from discovering that the Defendants unlawfully exchanged kickbacks for patient referrals and that the Fraudulent Equipment were billed to GEICO to maximize financial gain without regard to genuine patient care.

225. Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the prescriptions for the Fraudulent Equipment were medically unnecessary, in some instances were forged or unauthorized, and were issued pursuant to predetermined protocols, rather than to benefit the Insureds who supposedly received the Fraudulent Equipment.

226. Lastly, the Defendants knowingly misrepresented what was provided to the Insureds and the permissible reimbursement amount for the Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO in order to prevent GEICO from discovering that the Fraudulent Equipment was billed to GEICO for impermissible financial gain.

227. The billing and supporting documentation submitted by the Defendants, when viewed in isolation, did not reveal its fraudulent nature.

228. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

229. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $180,000.00 based upon the fraudulent charges.

230. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Gevorina
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

231.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 230 of this Complaint as if fully set forth at length herein.

232.    There is an actual case in controversy between GEICO and Gevorina regarding more than $1.8 million in fraudulent billing that has been submitted to GEICO in the name of Gevorina.

233.    Gevorina has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for the Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

234.    Gevorina also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

235.    Gevorina has no right to receive payment for any pending bills submitted to GEICO because the charges fraudulently misrepresented what was provided to the Insureds.

236.    Gevorina has no right to receive payment for any pending bills submitted to GEICO because – to the extent that Gevorina provided any Fraudulent Equipment– Gevorina fraudulently misrepresented that the charges for the Fraudulent Equipment contained within the bills were equal to or less than the maximum permissible reimbursement amount.

237.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Gevorina.

## SECOND CAUSE OF ACTION
### Against Gevorgyan
### (Violation of RICO, 18 U.S.C. § 1962(c))

238.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 230 of this Complaint as if fully set forth at length herein.

239.     Gevorina is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

240.     Gevorgyan knowingly conducted and/or participated, directly or indirectly, in the conduct of Gevorina's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly two years seeking payments that Gevorina was not eligible to receive under the New York No-Fault Laws because: (i) Gevorina submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Gevorina submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Gevorina submitted bills to GEICO for Fraudulent Equipment that it did not actually provide to Insureds; and (iv) to the extent that Gevorina actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

241.     Gevorina's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Gevorgyan operates Gevorina, insofar as Gevorina is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Gevorina to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Gevorgyan continues to submit and attempt collection on the fraudulent billing submitted by Gevorina to the present day.

242.     Gevorina is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Gevorina in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

243.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through Gevorina.

244.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Gevorgyan and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

245.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 230 of this Complaint as if fully set forth at length herein.

246. Gevorina is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

247. Gevorgyan and John Doe Defendants 1-10 are owners of, employed by, or associated with the Gevorina enterprise.

248. Gevorgyan and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Gevorina's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for greater than two years seeking payments that Gevorina was not eligible to receive under the New York No-Fault Laws because: (i) Gevorina submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Gevorina submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Gevorina submitted bills to GEICO for Fraudulent Equipment that it did not actually provide to Insureds; and (iv) to the extent that Gevorina actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

249.     Gevorgyan and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

250.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through Gevorina.

251.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Gevorina and Gevorgyan**
**(Common Law Fraud)**

252.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 230 of this Complaint as if fully set forth at length herein.

253.     Gevorina and Gevorgyan intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

254.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols

and not based upon medical necessity; (iii) in many claims, that the charges submitted to GEICO misrepresented that the Fraudulent Equipment was provided to the Insureds; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for the Fraudulent Equipment contained in the bills to GEICO misrepresented the permissible reimbursement amount.

255.     Gevorina and Gevorgyan intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Gevorina that were not compensable under the No-Fault Laws.

256.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted by the Defendants through Gevorina.

257.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

258.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Gevorina and Gevorgyan**
**(Unjust Enrichment)**

259.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 230 of this Complaint as if fully set forth at length herein.

260.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

261.    When GEICO paid the bills and charges submitted by or on behalf of Gevorina for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

262.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

263.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

264.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $180,000.00.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Gevorina, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Gevorina have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against Gevorgyan, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Gevorgyan and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$180,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      D.      On the Fourth Cause of Action against Gevorgyan and Gevorina compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $180,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

      E.      On the Fifth Cause of Action against Gevorgyan and Gevorina, more than $180,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: July 29, 2022
       Uniondale, New York

           RIVKIN RADLER LLP

           By: */s/ Barry I. Levy*
              Barry I. Levy, Esq.
              Michael A. Sirignano, Esq.
              Michael Vanunu, Esq.
              Melissa D. Medilien, Esq.
           926 RXR Plaza
           Uniondale, New York 11556
           (516) 357-3000

           *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*